IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | CR No. 22-CR-01859-WJ |
| ) | |
| vs. ) | |
| ) | |
| **WILLARD DEDIOS**, ) | |
| ) | |
| Defendant. ) | |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States respectfully submits this sentencing memorandum and hereby requests that the Court adopt the presentence investigation report and accept the plea agreement. The United States also respectfully recommends a sentence of between 132 and 165 months, 5 years of supervised release, a $100 special penalty assessment, and an assessment under the Justice for Victims of Trafficking Act of 2015.[1] In support, it states as follows:

**I.  Procedural Background**

On November 9, 2022, an Indictment was filed charging Defendant with two federal felony counts: Count 1 charged Production of a Visual Depiction of a Minor Engaging in Sexually Explicit Conduct, and Count 2 charged Sexual Abuse of an Incapacitated Person. Doc. 2. On February 22, 2024, Defendant pleaded guilty to Count 2 of the Indictment. Doc. 36.

As part of the negotiated plea agreement, the parties agreed to and recommend that the appropriate sentence in this case, for the Court's specific determination, is a term within the properly calculated guidelines range as calculated by the Court followed by a two-level downward variance, and a downward departure pursuant to United States Sentencing Guideline

---

[1] Applicable only if Defendant is found to be non-Indigent.

§5G1.3 for time served in tribal custody for the same conduct that gave rise to this matter. As consideration for this agreement, the United States agrees to dismiss Count 1 after sentencing is complete. In return, the Defendant has agreed to waive certain rights – to include his right to trial and his right to appeal, and he acknowledges his legal obligation to register under the Sex Offender Registry and Notification Act.

II. **Argument**

After calculating Defendant's base offense levels for the single count and after applying applicable adjustments, Defendant's offense level is 35. PSR ¶ 33. He received a total of a three-level reduction for acceptance of responsibility. PSR ¶¶ 31-32. Defendant has a criminal history score of zero (0), resulting in a criminal history category of I. PSR ¶¶ 37-38. Based on the PSR's evaluation, Defendant's guideline range is 168 to 210 months. PSR ¶ 81. After an additional two-level downward variance and a downward departure for credit for time served, the final guidelines are 132-165 months. ¶ 98. This differs from the guideline range that would have applied if Defendant were convicted at trial where his offense level would have been 38. PSR ¶ 82. His guideline range would have been 235-293 months. ¶ 82. By entering into the plea agreement at bar, Defendant drastically reduced his exposure to a lengthier term of imprisonment, and he therefore benefited immensely.

A. **Defendant's 11(c)(1)(C) Plea Agreement**

In consideration of acceptance of Defendant's plea agreement, the United States asks this Court to consider the parties' interests in minimizing the uncertainties of trial by negotiating this settlement. "The potential to conserve valuable prosecutorial resources and for defendants to admit their crimes and receive more favorable terms at sentencing means that a plea agreement can benefit both parties." *Missouri v. Frye*, 132 U.S. 1399, 1407 (2012). Parties in a criminal case must assess the likely outcome of motions and trial practice. Defendants in particular must

2

weigh their tolerance for the risk of losing a trial against the benefits of a negotiated settlement. Likewise, the United States must weigh the public's interests against the risks of proceeding to trial. In consideration of the agreement reached between the parties, the United States carefully weighed the evidence in this case, Defendant's willingness to admit the facts substantiating Count 2 of the Indictment, the considerable resources that going to trial would require for this matter, and the finality that the provisions of this agreement bring to the matter. Of critical importance to the interests of justice, this plea agreement provides certainty and finality to the victim, who occupies a precarious position of vulnerability as a young victim who would face her assailant in court and have to give testimony at trial. Accordingly, the United States respectfully requests that this Court accept Defendant's plea agreement.

The terms of the agreement permit leniency in exchange for Defendant taking responsibility for some of the criminal acts alleged. However, the terms also acknowledge and appropriately sanction Defendant for the heinous acts of his crime. As a result, the United States requests that the Court impose a sentence within the adjusted guidelines in this case – which all still result in a sentence of over 10 years in prison.

### B. Application of Sentencing Guidelines and Factors Considered Pursuant to 18 U.S.C. § 3553(a)

The United States Sentencing Guidelines are advisory. See *United States v. Booker*, 543 U.S. 220, 234 (2005). Moreover, a reviewing court may accord a properly calculated sentence to have a presumption of reasonableness for appellate purposes. *Rita v. United States*, 551 U.S. 338, 347 (2007). A district court, on the other hand, cannot presume reasonableness. In determining a sentence, the district court must conduct an analysis using both the Guidelines and the sentencing statutes. Both the sentencing judge and the Sentencing Commission "are carrying out the same basic § 3553(a) objectives, the one, at retail, and the other at wholesale." *Id.* at 345. The

Guidelines can be assumed to be a "rough approximation" of a sentence that would "achieve § 3553(a)'s objectives." *Id.* at 347-349. Hence, the district court should impose sentences within the calculated guidelines range when a departure is not appropriate because Guidelines sentences prevent unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) and because the Sentencing Commission policies articulated in the Guidelines are sound and reasoned as a matter of public policy.

However, in the case of a plea agreement where parties agree to a sentence below the standard guidelines, public policy also favors accepting those agreements, which are an essential component of the criminal justice system. *See Santobello v. New York*, 404 U.S. 257 (1971). Here, the recommended sentence includes a downward variance equivalent to two additional offense levels and credit for time served. The resultant guidelines are *drastically* lower than the guidelines that would have applied if Defendant had been convicted at trial. Such is the nature of this kind of plea – that Defendant bargained for a plea agreement and entered a contract in consideration of the vagaries of trial.

   1. <u>Nature and Circumstances of the Offense</u>

On or about May 26, 2022, Willard Dedios sexually assaulted 16-year-old Jane Doe while she was incapacitated. He penetrated her anus or vagina with his fingers and took photos of the assault which were later found on his cell phone. Dedios and Doe are both Indians for purposes of federal law and the assault took place in Dulce, within the exterior boundaries of the Jicarilla Apache reservation – in Indian Country.

About a month before the assault, Jane Doe ran away from home. At the time she ran away, Jane Doe was living with L.J., who is Jane Doe's grandmother. Although she wasn't staying at L.J.'s house in Dulce, she was staying in the general area and was in contact with some family members. On the night that the assault happened, she was with her aunt, R.C,. who

took her to Dedios's house. Jane Doe knew Dedios already and considered him to be something of a father-figure. Jane Doe said that she and R.C. were already inebriated. But they got to Dedios's house, he provided them with more alcohol.

At some point, Jane Doe went to sleep. She woke up two times during the night. The first time she woke up, she found that R.C. was gone. Dedios convinced her not to worry about it and fed her more alcohol and marijuana. She drank again and eventually passed out on a mattress in the living room. Later, she woke up a second time and found Dedios on top of her. She remembers that she tried to push him off but she passed out again without succeeding.

When she awoke the next time, it was morning. She felt weird because Dedios was lying asleep next to her and the button on her pants was open. She saw R.C. was back and cooking food, so she got up. Jane Doe was not sure what happened and told R.C. she wanted to leave.

As they left the house, R.C. grabbed a phone that she thought was hers. Later, it turned out she grabbed the wrong phone and the one she grabbed actually belonged to Dedios. Jane Doe and R.C. went to another woman's house. There, R.C. turned on and opened the phone and saw a photo album containing naked pictures of both R.C. and Jane Doe. Neither had consented to the photos. R.C. told Jane Doe that R.C. deleted the photos. Some time later, Jane Doe parted ways with R.C. and ended up with the phone, which was off for lack of a charge.

A day later, Jane Doe called her father and told him that Dedios raped her and that he took explicit photos of her on his phone. The father told Jane Doe's other aunt, T.D.J. and together they went looking for Jane Doe. They found her at the Dulce Park and she got in to T.D.J.'s car with T.D.J., her father, and a cousin. According to T.D.J., Jane Doe appeared upset and shaken. T.D.J. asked Jane Doe if she wanted to report the rape and explained to her what the

5

process would look like.[2] T.D.J. related that during the conversation, Jane Doe said she wanted Dedios to go to jail for what he did to her. After a short discussion, T.D.J. called emergency services. Late that evening, a Jicarilla Apache Nation police officer was dispatched to the Dulce Park to investigate a report of a rape of a juvenile.

The Officer asked Jane Doe to tell him what happened and she said she didn't know how they got to that house, that she woke up and saw Dedios and asked him how she got to his house and that he said they arrived some time before. She shared that he gave her alcohol. When the officer asked who Willard was, she said "Willard Dedios," and said that he was the one who did it. Jane Doe told the officer that her aunt, R.C., found naked pictures of her on Dedios's phone and deleted them.

EMS arrived a short time later and examined Jane Doe. They learned that she had scratches on the inside of her legs and on her back, and she revealed to EMS that she had pushed Dedios away and told him, "no." They also discovered that the jacket she was wearing was the same as she had on during the incident and that it had not been washed. They noted that it had a substance on it that may have been bodily fluid, and it was collected as evidence.

Just after midnight on May 28th, 2022, a Jicarilla Apache Police Department Criminal Investigator was contacted. The investigator and T.D.J. arranged a SANE exam for the next day and Jane Doe went home with her father.

However, the next morning Jane Doe missed her SANE exam. She later explained that she was still scared by what happened, which caused her not to come. Eventually, her aunt, T.D.J., convinced her to go complete the SANE, which she did. According to T.D.J., during their discussions Jane Doe expressed that she had some bruising and had pain along her legs.

---

[2] T.D.J. is associated with law enforcement and is professionally familiar with the import of SANE examinations. T.D.J. also personally called Sexual Assault Services of Northwest New Mexico and arranged for the examination.

The SANE exam was conducted on June 1 and revealed multiple bruises over Jane Doe's entire body. Additionally, she had substantial bruising and an abrasion in her vaginal area. During the exam, Jane Doe realized she still had Dedios's phone in her pocket, which she had charged at some point. She accessed the phone, went to the deleted photos folder, and found it contained photos of her while she was passed out. Some of the photos depicted her laying down with her shirt lifted, exposing her bare chest. Others depicted her pubic area and vagina, with a person's hand near her vagina in one photo, and in another photo, one or more fingers of that hand appear like they could be penetrating her vagina or anus—though the photos are inconclusive.

Jane Doe gave the phone to T.D.J., who gave it to a Criminal Investigator on June 2. T.D.J. told him that the phone contained the photos in which Jane Doe was visibly sexually assaulted. Upon review of the phone, the investigator saw a passed-out female who he identified as Jane Doe. He also saw the other photos described above.

Subsequent search warrants were obtained for the physical location of the assault and for the cellular device belonging to Dedios.

The cell phone warrant was executed at RCFL Albuquerque. On the 8th, investigators reviewed the extracted data and found selfies of Willard Dedios, images and videos of his residence, the situs of the assault, the images of Jane Doe that she and T.D.J. reported and provided, an account login for Facebook (Willard Dedios), and an image of a piece of mail with Willard Dedios's information on it. This substantiated that the phone belonged to Dedios. Investigators noted that in the photos of Jane Doe, she was laying on a mattress on or next to a pillow with a Dallas Cowboys logo, that there were dark curtains hanging from the window, and a broken section of floor tile near her.

On June 9th, 2022, investigators executed a search warrant at Dedios's home. They located the mattress that was seen in the photo with a grey fitted sheet (it was no longer on the floor, and instead had been used to block the front door. The group made forced entry through that door to begin the search). They found the Cowboys pillow in the living room and noted that the room also had the same dark curtains, blanket, and broken floor tile seen in the photo. The group took the items—including the bed—and arranged them in the fashion seen in the photos. The scene was a match and confirmed to them that Jane Doe was photographed and assaulted in that living room, in Dedios's home.



2. *History and Characteristics of the Defendant*

This § 3553(a) factor favors Defendant. Defendant's criminal conviction history is almost entirely non-existent. He has a mild history of arrests with little information about the circumstances of most of the incidents. Importantly, there does not appear to be any prior

misconduct of the sort committed here. Of note, Defendant denies any mental or emotional health condition. There is not a reported concern about Defendant's background and upbringing,

Defendant communicated to the Probation Office that he might have been a hard drinker at times but is not otherwise suffering from any severe substance abuse disorders. This belies the facts of the current case where Defendant plied Jane Doe with alcohol and marijuana. Admittedly, there is not reliable evidence that Defendant himself was under the influence during this crime. However, Defendant's use of substances in order to take advantage of Jane Doe is a noteworthy aspect of this case's nature and circumstances.

3. *The Need for the Sentence Imposed to Promote Respect for the Law, Provide Just Punishment, Adequate Deterrence, and to Protect the Public from Further Crimes of the Defendant*

Sexual acts against minors – and particularly against a 16-year-old by a man in his late 50s – call for sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, and to deter others. 18 U.S.C. § 3553(a)(2)(A) and (B). Those public policy goals are matched by the most important consideration here: the sentence must act to protect the young victim in this case and children generally. 18 U.S.C. § 3553(a)(2)(C).

With that driving principle in mind and considering the conduct in this case, a sentence of 132-165 months adequately achieves each policy goal. A sentence of over 10 years for this single and only known instance of sexual misconduct is an award that recognizes the seriousness of this offense. It also promotes respect for the law by sending a message that even a single instance of egregious criminal acts may result in a substantial sentence. Thus, it provides for both specific and general deterrence – discouraging criminal sexual misconduct by this defendant and by others in the community.

Importantly, a sentence within this range will allow Jane Doe to grow out of her teenage years without Defendant's menacing presence and will protect other young people in the wider community through incapacitation.

   4. *Treatment and Rehabilitation*

Importantly, a sentence over 132 months will also protect the public from further crimes and give Defendant the opportunity to complete programming geared toward his criminal misconduct– which may ultimately have the effect of returning a better citizen to the community. The Defendant should undergo the Bureau of Prisons' sex offender treatment program during his term of incarnation and after he is released, he should continue with a psychosexual evaluation and the recommended follow-on treatment. Following the necessary period of incarceration, these interventions should serve as a turning point for Defendant and permit him to live a life devoid of sexual abuse.

## III. CONCLUSION

The United States respectfully requests that this Court sentence the Defendant to a sentence of between 132 and 165 months, 5 years of supervised release, a $100 special penalty assessment, and an assessment under the Justice for Victims of Trafficking Act of 2015.[3] This recommended sentence is "sufficient, but not greater than necessary to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a).

                                          Respectfully submitted,

                                          ALEXANDER M.M. UBALLEZ
                                          United States Attorney

---

[3] Applicable only if Defendant is found to be non-Indigent.

          */s/ Filed Electronically July 12, 2024*
          ALEXANDER F. FLORES
          Assistant United States Attorney
          P.O. Box 607
          Albuquerque, New Mexico 87103
          (505) 346-7274
          (505) 346-7296 fax

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2024, I filed the foregoing document electronically through the CM/ECF system. Pursuant to the CM/ECF Administrative Procedures Manual, §§ 1(a), 7(b)(2), such filing is the equivalent of service on parties of record.

      /s/
ALEXANDER F. FLORES
Assistant U.S. Attorney